KOTHARI LAW LLC
Vivek Kothari (OSB No. 182089)
555 SE Martin Luther King Jr. Blvd.
Suite 3022
Portland, OR 97214
Telephone: (503) 567-6735
vivek@kothari.law

*Attorney for Plaintiff*

[Additional counsel on signature page.]

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| ARENA CHIU-YUEH CHANG, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>NUSCALE POWER CORPORATION, JOHN HOPKINS, ROBERT HAMADY, CARL FISHER, and CLAYTON SCOTT,<br><br>Defendants. | **Case No. 3:26-cv-2483**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Arena Chiu-Yueh Chang ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of

the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding NuScale Power Corporation ("NuScale" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired NuScale securities between February 27, 2026 and September 10, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. NuScale purports to redefine nuclear power through the development of proprietary small module reactors ("SMRs") and associated technology that purportedly will deliver safe, scalable, cost-effective, and reliable carbon-free power. NuScale's self-described "core technology" is the Light Water Nuclear Reactor NuScale Power Module™ ("NPM").

3. At all relevant times, Defendants represented that NuScale enjoyed a competitive advantage as "the industry's first mover".

4. Moreover, at all relevant times, Defendants represented that NuScale "has been working with one customer and one prospective customer." The Company's customer is RoPower Nuclear S.A. ("RoPower"), a joint venture established by, *inter alia*, S.N. Nuclearelectrica S.A.

("Nuclearelectrica"), a Romanian national energy company. NuScale conducted its work for RoPower as a subcontractor to Fluor Enterprises, Inc. ("Fluor"), a related party to NuScale.

5. The Company's prospective customer is ENTRA1 Energy, LLC ("ENTRA1"), NuScale's "exclusive global strategic partner for commercialization and development of power plants utilizing NPMs." Defendants frequently touted a non-binding agreement between ENTRA1 and the Tennessee Valley Authority ("TVA") to deploy up to 6 gigawatts ("GW") of power from NuScale's SMRs. Defendants also frequently represented that ENTRA1 and the TVA were progressing toward entering a purchase power agreement ("PPA") with the TVA, a necessary step before NuScale could generate revenue from any work for the TVA. RoPower was the Company's only customer and ENTRA1 was its only prospective customer.

6. On February 12, 2026, Nuclearelectrica announced that its shareholders had approved a final investment decision ("FID") for its small modular reactors project in Doiceşti, Romania (the "RoPower Project"), clearing the way for Nuclearelectrica to move "from the analysis phase to the implementation phase". In its announcement, Nuclearelectrica also stated that the FID was "based on a series of additional conditions" that it would have to satisfy.

7. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated NuScale's purported "first mover" competitive advantage; (ii) Defendants overstated NuScale's ability to generate revenue from either the RoPower Project or any work for the TVA; (iii) the Company's commercial prospects, including its remaining cash runway, were therefore likewise overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

8. The truth began to emerge on September 11, 2026, when UBS downgraded NuScale from "Neutral" to "Sell" and lowered its price target from $10 to $6. UBS opined that NuScale was rapidly losing its "first-mover" advantage in SMR technology to faster-moving competitors. UBS also flagged a lengthy five-year build timeline, a critical lack of firm customer commitments, and projected a massive $700 million in negative free cash flow between 2026 and 2028. The report also described stagnating progress regarding NuScale's RoPower Project and the risk that the TVA would not ultimately move forward with NuScale.

9. On this news, NuScale's stock price fell $1.60 per share, or 15.67%, to close at $8.61 per share on September 11, 2026.

10. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). NuScale is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

14. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15. Plaintiff, as set forth in the attached Certification, purchased or otherwise acquired NuScale securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Defendant NuScale is a Delaware corporation with principal executive offices located at 5005 Meadows Road, Lake Oswego, Oregon 97035. The Company's Class A common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "SMR."

17. Defendant John Hopkins ("Hopkins") has served as NuScale's President and Chief Executive Officer ("CEO"), as well as a member of its Board of Directors, at all relevant times. During the Class Period, Defendant Hopkins sold 82,667 shares of NuScale Class A common stock for total proceeds of approximately $1.01 million.

18. Defendant Robert Hamady ("Hamady") has served as NuScale's Chief Financial Officer at all relevant times. During the Class period, Defendant Hamady sold 88,450 shares of NuScale Class A common stock for total proceeds of approximately $900,000.

19. Defendant Carl Fisher ("Fisher") has served as NuScale's Chief Operating Officer at all relevant times. During the Class period, Defendant Fisher sold 90,245 shares of NuScale Class A common stock for total proceeds of approximately $1.07 million.

20. Defendant Clayton Scott ("Scott") has served as NuScale's Chief Commercial Officer at all relevant times. During the Class period, Defendant Scott sold 22,478 shares of NuScale Class A common stock for total proceeds of approximately $284,681.

21. Defendants Hopkins, Hamady, Fisher, and Scott are collectively referred to herein as the "Individual Defendants."

22. The Individual Defendants possessed the power and authority to control the contents of NuScale's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of NuScale's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with NuScale, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

23. NuScale and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24. NuScale purports to redefine nuclear power through the development of proprietary SMRs and associated technology that purportedly will deliver safe, scalable, cost-effective, and reliable carbon-free power. NuScale's self-described "core technology" is the NPM.

25. At all relevant times, Defendants represented that NuScale enjoyed a competitive advantage as "the industry's first mover".

26. Moreover, at all relevant times, Defendants represented that NuScale "has been working with one customer and one prospective customer." The Company's customer is RoPower, a joint venture established by, *inter alia*, Nuclearelectrica, a Romanian national energy company. NuScale conducted its work for RoPower as a subcontractor to Fluor, a related party to NuScale.

27. The Company's prospective customer is ENTRA1, NuScale's "exclusive global strategic partner for commercialization and development of power plants utilizing NPMs." Defendants frequently touted a non-binding agreement between ENTRA1 and the TVA to deploy up to 6GW of power from NuScale's SMRs. Defendants also frequently represented that ENTRA1 and TVA were progressing toward entering a PPA, a necessary step before NuScale could generate revenue from any work for the TVA.

28. On February 12, 2026, Nuclearelectrica announced that its shareholders had approved an FID for the RoPower Project, clearing the way for Nuclearelectrica to move "from the analysis phase to the implementation phase". In its announcement, Nuclearelectrica also stated that the FID was "based on a series of additional conditions" that it would have to satisfy.

## Materially False and Misleading Statements

29. The Class Period begins on February 27, 2026, the day after NuScale, during post-market hours, filed with the SEC an annual report on Form 10-K reporting its operating and financial results for the quarter and fiscal year ended December 31, 2025 (the "FY 2025 10-K"), issued a press release announcing the same, and held a conference call to discuss the same (the "FY 2025 Earnings Call"). The press release quoted Defendant Hopkins as representing that Defendants had "solidified our position" with respect to NuScale's competitors and "made

meaningful progress toward commercialization" through accomplishments including ENTRA1's nonbinding agreement with TVA, stating in relevant part[1]:

> "For NuScale, 2025 was a breakthrough year, in which we further solidified our position as the SMR industry's first mover," said John Hopkins, NuScale President and Chief Executive Officer. "***We made meaningful progress toward commercialization, with our exclusive global commercialization partner, ENTRA1, reaching a nonbinding collaborative agreement with TVA to deploy up to 6 gigawatts of NuScale small modular reactor ("SMR") capacity across TVA's seven-state service region***. Furthermore, we remain the first and only SMR technology to have received design approval from the U.S. Nuclear Regulatory Commission, including our uprated 77 MWe NuScale Power ModuleTM ("NPM"), placing us at the forefront of advanced nuclear."

30. During his prepared remarks on the FY 2025 Earnings Call, Defendant Hopkins reiterated that NuScale made "significant progress" during the preceding fiscal year, citing the nonbinding agreement between ENTRA1 and the TVA, among other items. Specifically, Defendant Hopkins stated, in relevant part:

> ***I'll start with some key highlights from 2025, a year marked by significant progress for NuScale. . . .*** [O]ur exclusive global commercialization partner, ***ENTRA1 Energy reached an agreement with the Tennessee Valley Authority or TVA to supply 6 gigawatts of power by deploying the largest nuclear power program in U.S. history***. In ENTRA1, we use NuScale SMR technology inside its power plants. ***Both are incredibly important milestones in our commercialization journey and gives us strong momentum going into 2026*** to pioneer the SMR space as the only [Nuclear Resource Commission ("NRC")] certified SMR under 10 CFR Part 52 versus other technologies pursuing 10 CFR Part 50.

31. As Defendant Hopkins continued to tout the nonbinding agreement between ENTRA1 and the TVA, he represented that the two entities were making "significant progress" in negotiating a PPA, stating in relevant part:

> Now turning to Slide 3. We list ***NuScale's fourth quarter and recent highlights***, which we will discuss in more detail in a moment. They ***include significant progress made by ENTRA1 and TVA on a power purchase agreement or PPA*** as well as the completion of our work on Fluor [Enterprises, Inc.]'s Phase 2 front-end

[1] All emphases herein are added unless otherwise indicated.

> engineering and design or FEED study for the proposed RoPower Doiceşti power plant in Romania. . . . In September of last year, TVA announced an agreement in connection with the purchase of power from ENTRA1 for 6 gigawatts, which would represent a total deployment of 72 NuScale Power Modules or NPMs and 6 ENTRA1 Energy plants, providing power to support TVA 7-state service region. ***In the 5 to 6 months since the program was announced, we understand that ENTRA1 and TVA have advanced discussions, maintaining strong momentum in collaboration in their efforts***.

32. Defendant Hopkins continued to provide specific reasons for representing that ENTRA1 and the TVA had "advanced discussions", listing five "recent steps [that] have been taken to move the program forward", including "drafting of a definitive PPA" being "underway", stating in relevant part:

> Our understanding is that the following recent steps have been taken to move the program forward. First, ENTRA1 is assembling an infrastructure experienced team that includes design engineers, a construction contractor, owners' engineers, investors and legal advisers. Second, on project financing, several major financial institutions are working with ENTRA1 and discussions are underway. And one major institution has already signed a multibillion dollar term sheet with ENTRA1.
>
> Third, on the project execution side, site visits have been conducted, and site evaluations are underway by teams of qualified professional engineers and heavy infrastructure experienced individuals. Fourth, sites identified that could each support ENTRA1 plants powered by NuScale SMR technology with respect to the 6-gigawatt program. The prospective site for the first plant deployed has been identified.
>
> Fifth, ***drafting of a definitive PPA is underway with robust engagement from legal teams and progress is being made on transaction documentation and structure***. Finally, please note that TVA announced the deal last September, and the new TVA Board was confirmed just this January. Considering all of this, we believe that significant progress has been made relative to time.

33. Defendant Hopkins also updated investors on NuScale's RoPower Project during his prepared remarks, representing that Defendants expected continued revenue opportunities in the coming year, following the February 12, 2026 Nuclearelectrica shareholder vote in favor of the FID, stating in relevant part:

> Regarding Romania, by the end of 2025, NuScale completed its FEED 2 work for Fluor Corporation[2] to further RoPower's goal of developing and deploying their 6 module SMR power plant in Romania. ***In total, NuScale recognized $63.1 million in revenue from licensing fees and engineering work from the FEED 2 study over an 18-month period ending in December 2025***. Earlier in this slide, ***shareholders of Romania's SN Nuclearelectrica overwhelmingly voted in favor of progressing the RoPower project***. We understand that this all allows the projects to seek secured financing through further feasibility studies and site-specific design work and to advance the licensing and geotechnical work, finalize a pre-engineering procurement and construction, or [pre-]EPC contract, and begin negotiating contracts for long lead items.
>
> ***Therefore, we anticipate that they will have pre-EPC activities begin in the second quarter of this year and have an estimated duration of up to 15 months and will include, among other things, the development of a Class 2 cost estimate***. ***We look forward to continuing supporting Fluor on their Doiceşti project***.

34. During the question-and-answer portion of the FY 2025 Earnings Call, an analyst asked Defendants to discuss the cash available to NuScale and "the expected cash burn range for [2026]". In response, Defendant Hamady stated, in relevant part: "[R]est assured that we have taken a very conservative, very strong liquidity position. And ***burn rate or runway is not a problematic item for us. NuScale has the legs to run this race***."

35. Defendant Hamady offered a similar response when another analyst asked about Nuscale's "revenue and liquidity outlook . . . over the next 12 to 24 months", representing that NuScale was "conservatively positioned" and "runway is not an issue for us", stating in relevant part:

> As we stated earlier and as you pointed out in your question, we do not give guidance at this point. However, I think looking at our balance sheet, we look at our liquidity position, the company is conservatively positioned and prudently raised capital towards the end of last year or to give us a balance sheet that has lasting power and as I said, run rate and — pardon me, ***runway is not an issue for us***.

---

[2] Per the FY 2025 10-K, NuScale worked on the RoPower Project as subcontractor to Fluor Corporation's wholly owned subsidiary, Fluor Enterprises, Inc.

36. Analysts also asked Defendants to discuss the revenue NuScale might generate from its RoPower project, given the shareholder vote they mentioned during the FY 2025 Earnings Call. In response to one of these questions, Defendant Hopkins represented that Defendants were in close communication with the Romanian government, and that NuScale stood ready to continue its work once Fluor and RoPower completed a pre-EPC agreement, stating in relevant part:

> ***We met with the Romanian government last night, actually***. So it's a timely question. As we stated, FEED Phase 2 has been completed as of the last quarter. February, they did have a shareholders meeting that they voted in favor of moving the project forward. ***RoPower is now authorized to advance the licensing in geotechnical moving towards a pre-EPC and we anticipate NuScale will be generating revenues as soon as*** — now understand, we are a subcontractor to Fluor Corporation.[3] And Fluor is in negotiations right now with the RoPower government. Our contract is with Fluor. It's not with the Romanian government, and we explained this last night to the Romanian government, and they understood. ***We view this as a very important project that right now, we're waiting for the next steps via Fluor and RoPower to do their deal and then we move on***. It was an interesting conversation last night. They appreciated it.

37. When an analyst asked Defendants whether investors should expect revenue from a binding TVA PPA to "be comparable" with revenue generated in connection with RoPower, Defendant Scott stated that he expected "more" revenue from what NuScale generated from RoPower, stating in relevant part:

> So what we expect after the PPA is signed, is that we would enter into [combined operating license application ("COLA")] and FEED activities to generate revenue, which will allow us to move forward. ***But this is something that I would expect to be more than what we see in RoPower*** just because the size of the plants are much larger, and ***we anticipate a little bit more revenue stream in that respect***.

38. On May 7, 2026, NuScale filed with the SEC a quarterly report on Form 10-Q reporting its operating and financial results for the quarter ended March 31, 2026, issued a press

[3] Given representations in NuScale's FY 2025 10-K, Defendant Hopkins may have intended to mention Fluor Enterprises, Inc. instead. *See supra* ¶ 33 & n.2.

release announcing the same, and held a conference call to discuss the same (the "Q1 Earnings Call"). During his prepared remarks on that call, Defendant Hopkins summarized "several key highlights from the first quarter", including "continued advancement" on an ENTRA1-TVA PPA. In support, Defendant Hopkins offered investors an "update" from ENTRA1 that "***discussions* . . . *are advancing well toward a definitive PPA***." Defendant Hopkins also represented that NuScale, TVA, and ENTRA1 enjoyed "***strategic alignment***", and that Defendants "believe" the "TVA – ENTRA1 opportunity . . . will be the catalyst for the commercialization of our SMT technology" across the world, stating in relevant part:

> [L]et's review several key highlights from the first quarter. ***These include continued advancement on the ENTRA1 and TVA power purchase agreement discussions for what would be the largest nuclear deployment program in U.S. history***. . . . ***ENTRA1 has updated us [that] the discussions with TVA are advancing well toward a definitive PPA. We remain highly encouraged by the progress and the strategic alignment between ENTRA1, TVA and NuScale*** as we work to deliver this game-changing clean energy solution. . . . NuScale remains bullish about the TVA - ENTRA1 opportunity. ***We believe it will be the catalyst for the commercialization of our SMR technology in the United States and around the world***, while supporting fast-growing energy demand, creating thousands of high-quality jobs, and strengthening our nation's national security interests.

39. During the question-and-answer portion of the Q1 Earnings Call, an analyst followed up on an update Defendants provided concerning RoPower, asking "is the participation in the next phase contractually committed" or "more contingent on RoPower closing that third-party financing?" In response, Defendant Hamady did not directly answer the analyst's question and instead stated that "discussions are still ongoing" and reaffirmed Defendants' regular communication with RoPower, Nuclearelectrica, NuScale's contractor Fluor Corporation, and federal regulators, stating in relevant part:

> Good question. ***We have — in fact, we had one today[,] ongoing meetings every week with the Department of Energy, RoPower, Nuclearelectrica, Fluor and***

> ***others, discussing the status of the project***. We continue to, as we said, build out our supply chain. We are, as I stated before, a subcontractor to Fluor Corporation. Fluor is still in negotiations, what I'd call, what they call, pre-EPC. So as we are aware today, those discussions are still ongoing.

40. Later during the question-and-answer portion of the Q1 Earnings Call, Defendant Hamady represented that Defendants "anticipate[d]" a PPA between ENTRA1 and TVA "at some point soon", stating in relevant part:

> The funding at the project level though is completely separate from any of the PMA payments. PMA payments are partnership milestone agreement payments. And those come with, for example, the term sheet, which we already did and ***the PPA, which we anticipate doing in respect of TVA at some point soon***.

41. Later, after another analyst asked, "could there be a TVA opportunity finalized this year" and whether that would "drive some notable NuScale revenue in the coming quarters", Defendant Hamady offered a more specific date by which Defendants expected an ENTRA1-TVA PPA, stating that Defendants were "hopeful that TVA can come across the line at some point later this year", and that they "believe[d]" this outcome was "a strong possibility", stating in relevant part:

> ***We're hopeful that TVA can come across the line at some point later this year. We believe that's a strong possibilit***y. Our revenue stream, our cash flow this year, so TVA come across line with, for example, PPA, we anticipate that we will have site-specific — site-specific services, so pre-OEM services.
>
> If we look at RoPower as an example, we had technology licensing. We had pre-FEED, we had FEED Phase 2. All in with RoPower, we realized about $8 million worth of revenue. And that's pre an OEM contract. And that's over, I think, 2024 and 2025. . . . ***So we would anticipate something potentially in that scale once we get to a PPA with or once ENTRA1 gets a PPA with TVA***.

42. Another analyst asked Defendants for a more detailed explanation of the "progress" Defendants anticipated on the ENTRA1-TVA PPA discussions, noting that the TVA "[doesn't] seem to start with a fixed price PPA" in its discussions with competing nuclear reactor providers,

including GE Vernova Hitachi Nuclear Energy ("GE Hitachi"). In response, Defendant Scott stated that ENTRA1 was "***in those finalizations***" of its discussions with TVA, and in apparent reference to competing providers, claimed that "other sites may not be as mature or in a PPA situation that's not necessarily secured or even working with reactor suppliers that are not as advanced" and that NuScale was "***in a different position. We're ready to go, ready to deploy.***" Specifically, Defendant Scott stated, in relevant part:

> Yes, I think, it's a little bit of different scenario, I think. I mean PPAs are somewhat new to the nuclear industry and the process on how things move forward on a project perspective. ***So as we see it, ENTRA1 [is] in those finalizations of that deal***. And once that's performed, the sites have been — we've already kind of worked with the collective to identify the sites that will be worked on. And most of those sites are — have some level of preparation that have been progressed. So we would see us going into the COLA activities, into pre-FEED activities and supporting the supply chain for ENTRA1. ***So it's kind of different than what you've seen in some other sites that may not be as mature or in a PPA situation that's not necessarily secured or even working with reactor suppliers that are not as advanced***. ***So I think we're kind of in a different position. We're ready to go, ready to deploy.*** So I think once — once their deals have been secured, then we can start real activity that are COLA driven, not what you see today in the other.

43. On July 15, 2026, Nuclearelectrica announced that its shareholders had rejected a proposal to "reassess the initial development strategy for the Small Modular (SMR) by expanding the analysis to include other SMR technologies and broadening the list of potential sites (in the event of a decision to scale up)." Nuclearelectrica further stated that this proposal was intended "to serve as the foundation for an informed decision-making process . . . ***given that a number of conditions associated with the Final Investment Decision (FID) for the Doiceşti Project could not be met for reasons beyond the control of both Nuclearelectrica and the project company RoPower Nuclear S.A***."

44. On August 5, 2026, NuScale filed with the SEC a quarterly report on Form 10-Q reporting its operating and financial results for the quarter ended June 30, 2026, issued a press

release announcing the same, and held a conference call to discuss the same (the "Q2 Earnings Call"). During his prepared remarks on that call, Defendant Hopkins provided an update concerning ENTRA1's discussion with TVA concerning a PPA, representing that ENTRA1 "continues to advance" those discussions, describing them as "active and progressing" and stating in relevant part:

> ***ENTRA1 Energy, our strategic partner, continues to advance discussions with the Tennessee Valley Authority*** toward a definitive power purchase agreement for potentially the largest nuclear deployment program in U.S. history, utilizing NuScale SMR technology. ***Our understanding is that these discussions are active and progressing***. We look forward to providing a further update as milestones are achieved.

45. Defendant Hopkins also boasted of the cash available to NuScale while intimating that commercial deployment of its SMRs would occur in the "near-term", stating in relevant part: "Another highlight is our liquidity position. NuScale closed the second quarter with approximately $1.9 billion in cash, cash equivalents and investments. Our cash position reflects a conservative approach to liquidity as ***we anticipate near-term commercial deployment***."

46. Defendant Hamady echoed Defendant Hopkins's remarks, stating in relevant part:

> We closed Q2 with approximately $1.9 billion in cash, cash equivalents and investments, an increase of $900 million since March 31, 2026. ***As John said, this increase in liquidity reflects a proactive approach to conservatively positioning the business as we continue to deploy capital for commercial readiness***.

47. During the question-and-answer portion of the Q2 Earnings Call, when asked about "ENTRA1's project pipeline and how that's evolving just in terms of end users", Defendant Hopkins implied that an announcement concerning ENTRA1 and TVA's PPA negotiations was forthcoming, stating in relevant part:

> We continue dialogue with hyperscalers, data centers. ***Our focus right now has been for readiness for TVA when the announcement gets made***. But others that we talk to, and I think you recognize the need right now for clean energy. Texas

> just came out and stated here today that they have to shut down data center promotions because of lack of energy and water. We're an answer to that, and we're positioning ourselves to move forward quickly.

48. Later, an analyst asked Defendants for an update on the RoPower Project, citing "a more recent update to stick with NuScale rather than considering other technologies", in apparent reference to Nuclearelectrica's July 15, 2026 announcement, as referenced *supra* at ¶ 44. In response, Defendant Hopkins represented that NuScale was "ready to go" and "just waiting for the green light to finalize our contract agreements". Defendant Hopkins further stated that "we're going into . . . pre-EPC", notwithstanding Nuclearelectrica's July 15, 2026 statement that "conditions associated with the Final Investment Decision (FID) for the Doiceşti Project could not be met for reasons beyond [its] control", stating in relevant part:

> Yes. I could probably — this is John speaking, and I appreciate the question. We — as you know, we're a subcontractor to Fluor Corporation, who is a prime contractor. We completed successfully the front-end engineering design. There is a new government that's coming in that's being seated as we speak. Myself and [Defendant Fisher] are planning to go to Bucharest to meet with that government probably later this month.
>
> And — but ***we're ready to go. We're just waiting on the green light to finalize our contract agreements.*** But as I said, Phase 1 went well. ***Now we're going into what's called the pre-EPC***, which will take it up to the final notice to proceed, which is probably another year from now.

49. On the same date as the Q2 Earnings Call, the *Chattanooga Times Free Press* reported that the TVA was "in fast-paced negotiations" with GE Hitachi "to build advanced small modular reactors" in Alabama, quoting the TVA's interim CEO Mike Skaggs. When asked about that day's reporting concerning the TVA, Defendant Hopkins intimated again that an agreement with ENTRA1 was forthcoming, stating in relevant part:

> ***[A]ll that I can say at this time is that we're extremely encouraged by our conversations that ENTRA1 and TVA are having.*** We've heard similar that it was announced in a conversation today that TVA is actively engaged. It's the same

> what we're hearing. The conversations we understand are progressing well. ***And I can tell you that when the agreement is signed, NuScale will be ready to implement.***

50. The statements referenced in ¶¶ 30–43 and 45–50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants overstated NuScale's purported "first mover" competitive advantage; (ii) Defendants overstated NuScale's ability to generate revenue from either the RoPower Project or any work for the TVA; (iii) the Company's commercial prospects, including its remaining cash runway, were therefore likewise overstated; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

51. On August 20, 2026, the TVA released its Final Integrated Resource Plan ("Final IRP"), in which it released its anticipated incremental energy capacity needs between 2026 and 2040. Among other items, the TVA reported it generally expected "up to 5GW" of nuclear additions, and in one possible scenario, up to 5.4GW of nuclear additions. Both TVA's general expectations and the most favorable scenario suggested a lower nuclear addition than the 6GW provided by the nonbinding agreement between ENTRA1 and TVA.

52. In addition, throughout the Class Period, NuScale's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations. Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required NuScale to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered." Defendants' failure

to disclose, *inter alia*, stagnating progress toward an ENTRA1-TVA PPA agreement and pre-EPC work in connection with the RoPower Project violated Item 105 because these issues represented a material factor that made an investment in the Company speculative or risky.

53. Similarly, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required NuScale to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose, *inter alia*, the issues described in ¶ 50, *supra*, violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

**The Truth Begins to Emerge**

54. The truth began to emerge on September 11, 2026, when UBS downgraded NuScale from "Neutral" to "Sell" and lowered its price target from $10 to $6. UBS opined that NuScale was rapidly losing its "first-mover" advantage in SMR technology to faster-moving competitors. UBS also flagged a lengthy five-year build timeline, a critical lack of firm customer commitments, and projected a massive $700 million in negative free cash flow between 2026 and 2028. The report also described stagnating progress regarding NuScale's RoPower Project and the risk that the TVA would not ultimately move forward with NuScale.

55. Specifically, as to the RoPower Project, UBS cited Nuclearelectrica's July 15, 2026 announcement that "it was unable to meet several conditions associated with the RoPower FID", as alleged *supra* in ¶ 44. UBS explained that it viewed the introduction of the proposal that Nuclearelectrica shareholders had rejected that day "as an indication that the project is unlikely to

advance to pre-EPC, potentially leading to another project termination for NuScale", stating in relevant part:

> On 15-Jul-2026, Nuclearelectrica filed a current report stating that it was unable to meet several conditions associated with the RoPower FID.
>
> Nuclearelectrica also introduced a proposal to reassess the development strategy for RoPower by "expanding the analysis to include other SMR technologies and broadening the list of potential sites" at its shareholder meeting . . . . The proposal was rejected by shareholders, but ***we view its introduction by Nuclearelectrica as an indication that the project is unlikely to advance to pre-EPC***, ***potentially leading to another project termination for NuScale***.

56. As to NuScale's potential work for the TVA, UBS stated it had "seen little evidence of progress over the past year". UBS stated further that even if ENTRA1 and the TVA reached agreement on a PPA, it no longer expected NuScale to generate as much revenue from work for the TVA, given that the TVA's Final IRP released on August 20, 2026 provided for less incremental nuclear power than the 6GW contemplated by ENTRA1's agreement with the TVA, as alleged *supra* in ¶ 52, stating in relevant part:

> On 02-Sep-2025, the Tennessee Valley Authority (TVA) announced an MOU with ENTRA1 Energy to develop up to 6GW of nuclear capacity using NPMs. While progress on this agreement would be upside risk to our recommendation, ***we have seen little evidence of progress over the past year.***
>
> In Aug-2026, the Tennessee Valley Authority (TVA) released its updated Integrated Resource Plan (IRP) with 9 potential long-term capacity addition scenarios. TVA's reference case includes almost no incremental nuclear capacity additions through 2040 and peaks at ~5.4GW in the high-growth innovation-focused scenario . . . . ***In our view, the limited scale of TVA's projected nuclear capacity additions makes it increasingly unlikely TVA will move forward with the ENTRA1 agreement. However, if the agreement were to move forward, we would expect the cumulative capacity of NuScale projects to be significantly below the headline figure of 6GW.***

57. Moreover, UBS noted that the TVA had submitted to the NRC a construction permit application for a GE Hitachi SMR in May 2025, stating in relevant part:

> Competing SMR designs have gained significant commercial momentum. In May-2025, TVA submitted a construction permit application for a 300MW GE-Hitachi SMR plant to the NRC with targeted COD by YE2033. In our view, successful deployment of a GE Hitachi reactor will reduce the likelihood TVA moves forward with NuScale's plant design. NuScale's design offers limited differentiation from existing PWR designs available from larger, better capitalized counterparties with established construction histories, in our view.

58. On this news, NuScale's stock price fell $1.60 per share, or 15.67%, to close at $8.61 per share on September 11, 2026.

59. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Developments**

60. Following the end of the Class Period, on September 29, 2026, the NRC announced it had granted a permit for the TVA to construct the nation's first SMR, a 300-megawatt boiling-water reactor constructed by NuScale's competitor GE Hitachi.

## SCIENTER ALLEGATIONS

61. During the Class Period, Defendants had both the motive and opportunity to commit fraud. ***For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for NuScale securities, the Individual Defendants enriched themselves by selling 283,840 shares of NuScale Class A common stock for over $3.25 million in proceeds.*** Specifically, during the Class Period Defendant Hopkins sold 82,667 shares of NuScale Class A common stock, collecting proceeds of approximately $1.01 million; Defendant Hamady sold 88,450 shares of NuScale Class A common stock, collecting proceeds of approximately $900,000; Defendant Fisher sold 90,245 shares of NuScale Class A common stock, collecting proceeds of approximately $1.07 million; and

Defendant Scott sold 22,478 shares of NuScale Class A common stock, collecting proceeds of approximately $284,681.

62. Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time. RoPower was the Company's sole customer during the Class Period and Defendants repeatedly represented that they were in regular communication with RoPower Project stakeholders, including RoPower, Nuclearelectrica, and the Romanian government, as alleged *supra* in ¶¶ 37, 40, and 49. Similarly, ENTRA1 was the Company's sole prospective customer during the Class Period and Defendants repeatedly provided updates concerning ENTRA1's negotiations with the TVA, as alleged *supra* in ¶¶ 32, 33, 39, 45, and 50. In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired NuScale securities during the Class Period; and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

64. **Numerosity.** The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, NuScale securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and

can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by NuScale or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

65. **Typicality.** Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

66. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

67. **Commonality and Predominance.** Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period, misrepresented material facts about the business, operations and management of NuScale;
- whether the Individual Defendants caused NuScale to issue false and misleading financial statements during the Class Period;
- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;
- whether the prices of NuScale securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

68. **Superiority**. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

69. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- NuScale securities are traded in an efficient market;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and
- Plaintiff and members of the Class purchased, acquired and/or sold NuScale securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

70. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

71. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

72. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

73. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

74. During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of NuScale securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire NuScale securities and options at artificially inflated prices. In furtherance of this unlawful

scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

75. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for NuScale securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about NuScale's finances and business prospects.

76. By virtue of their positions at NuScale, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

77. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of NuScale, the Individual Defendants had knowledge of the details of NuScale's internal affairs.

78. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of NuScale. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to NuScale's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of NuScale securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning NuScale's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired NuScale securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

79. During the Class Period, NuScale securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of NuScale securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of NuScale securities was substantially lower than the prices paid by Plaintiff and the other

members of the Class. The market price of NuScale securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

80. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

81. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

82. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83. During the Class Period, the Individual Defendants participated in the operation and management of NuScale, and conducted and participated, directly and indirectly, in the conduct of NuScale's business affairs. Because of their senior positions, they knew the adverse non-public information about NuScale's misstatement of income and expenses and false financial statements.

84. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to NuScale's

financial condition and results of operations, and to correct promptly any public statements issued by NuScale which had become materially false or misleading.

85. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which NuScale disseminated in the marketplace during the Class Period concerning NuScale's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause NuScale to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of NuScale within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of NuScale securities.

86. Each of the Individual Defendants, therefore, acted as a controlling person of NuScale. By reason of their senior management positions and/or being directors of NuScale, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, NuScale to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of NuScale and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

87. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by NuScale.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2026

Respectfully submitted,

KOTHARI LAW LLC

*/s/ Vivek Kothari*
Vivek Kothari (OSB No. 182089)
555 SE Martin Luther King Jr. Blvd.
Suite 3022
Portland, OR 97214
Telephone: (503) 567-6735
vivek@kothari.law

POMERANTZ LLP
Jeremy A. Lieberman*
J. Alexander Hood II*
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

**Pro hac vice* application forthcoming